Shelly FRENCH, Appellant,

v.

JADON, INC., d/b/a Chilkoot Charlie's,
and Tommy McCullock, Appellees.

No. S–5688.

Supreme Court of Alaska.

Feb. 9, 1996.

Stan Hafferman, Anchorage, for Appellant.

Paul L. Davis and John P. Sloan, Paul L. Davis and Associates, Anchorage, for Appellees.

Before MOORE, C.J. and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

### I.  INTRODUCTION

Chilkoot Charlie's (Chilkoot's) employed Shelly French as a cocktail waitress.  After

Chilkoot's fired her, French sued Chilkoot's, Jadon, Inc. (owner of Chilkoot's), and a Chilkoot's manager (Tommy McCullock). French claimed Chilkoot's wrongfully terminated her employment by violating the implied covenant of good faith and fair dealing. She also claimed employees at Chilkoot's sexually harassed her, defamed her, failed to timely tender her final pay, and miscalculated her vacation pay. Chilkoot's claimed it fired her because tardiness and absenteeism made her an unreliable employee. The superior court granted summary judgment to Chilkoot's on all counts. French appeals to this court.

We reverse the summary judgment on the defamation claim and vacate the award of attorney's fees. We affirm on the remaining issues.

## II.  STATEMENT OF FACTS

Chilkoot's hired French as a cocktail waitress in May 1988. It fired her after she called in sick on February 16, 1990.

The day after her termination, French wrote Chilkoot's a letter. In it she admitted she had been late on some occasions but claimed to have improved. She explained why she had missed work on a recent occasion. Her letter asserted that she had been unjustly terminated and threatened legal action unless Chilkoot's agreed to give her good employment references and deem her termination a voluntary resignation. French also stated that she was entitled to a "few weeks" of severance pay and to at least three and one-half weeks of vacation pay.

Mike Gordon, the owner of Jadon, Inc., met with French three days later to discuss her concerns regarding her vacation pay. Chilkoot's offered French a check reflecting one week's vacation pay and her wages due; French declined to accept the check.

Soon after French was terminated, a Chilkoot's manager, McCullock, allegedly made defamatory comments about her to her boyfriend, Shawn Norton. Norton also worked at Chilkoot's.

French sued Chilkoot's, Jadon, and McCullock. She claimed in her complaint that Chilkoot's fired her because she refused to date her supervisor's brother or engage in "unethical and illegal activities," and that her firing amounted to wrongful termination and sex discrimination. French accused McCullock of making "untrue racial and sexual references" about French's chastity after she had been terminated, and claimed that his comments were slanderous. French also complained that, in violation of AS 23.05.140(b), Chilkoot's did not promptly tender all pay due her.

Chilkoot's moved for summary judgment, claiming that French lacked sufficient evidence to support her claims. Chilkoot's supported its motion with two affidavits of Doran Powell (Chilkoot's general manager), French's discovery responses, and portions of her deposition transcript.

French opposed the motion. She cited depositions taken previously but did not support her opposition with any affidavits. At the conclusion of oral argument on the motion, the superior court granted summary judgment to Chilkoot's on all counts, dismissing French's complaint. The superior court denied French's motion for reconsideration and ordered French to pay Chilkoot's $10,000 in attorney's fees after ordering entry of final judgment for Chilkoot's. This appeal followed.

## III.  DISCUSSION

### A.  Standard of Review

We will affirm the superior court's grant of summary judgment if the evidence in the record presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c); *Broderick v. King's Way Assembly of God Church*, 808 P.2d 1211, 1215 (Alaska 1991). The moving party has the burden of proving an absence of issues of material fact. *Wassink v. Hawkins*, 763 P.2d 971, 973 (Alaska 1988). If the movant makes a prima facie showing that he or she is entitled to judgment on the established facts as a matter of law, the opposing party must demonstrate that a genuine issue of fact exists to be litigated by showing that it can produce admissible evidence reasonably tending to dispute the movant's evidence.

*Id.* at 973; *Gregor v. City of Fairbanks,* 599 P.2d 743, 746 (Alaska 1979).

In deciding whether the non-moving party has met this burden, the court will "consider the affidavits, depositions, admissions, answers to interrogatories and similar material to determine ... whether any of the [evidentiary] material suggests the existence of any ... triable genuine issues of material fact." *Broderick,* 808 P.2d at 1215 (quoting *Walker v. White,* 618 P.2d 561, 563 (Alaska 1980)). If the parties choose to submit affidavits, they must be based upon personal knowledge, set forth facts that would be admissible evidence at trial and affirmatively show that the affiant is competent to testify to the matters stated. Alaska R.Civ.P. 56(e). Specifically, hearsay statements that would be inadmissible at trial are inadmissible in a motion for summary judgment. *Williford v. L.J. Carr Investments, Inc.,* 783 P.2d 235, 238 n. 8 (Alaska 1989). *But see Adkins v. Nabors Alaska Drilling, Inc.,* 609 P.2d 15, 22 (Alaska 1980) (providing that court may consider hearsay affidavit to which no objection is made).

## B. *Wrongful Termination Claim*

French argues that the superior court erred in granting summary judgment on her wrongful termination claim. Her unverified complaint alleged that Chilkoot's breached the implied covenant of good faith and fair dealing and wrongfully terminated her after she refused to date her supervisor's brother and refused to engage in "unethical and illegal activities in order to continue her employment relationship with [Chilkoot's]." She argues that genuine fact disputes precluded summary judgment.

Chilkoot's, however, claims it terminated French because habitual tardiness and a propensity to call in sick made her a poor employee, and asserts that her termination did not breach the covenant of good faith and fair dealing and was not wrongful. Two affidavits of Powell, Chilkoot's general manager, supported Chilkoot's summary judgment motion. Powell affied that French was often late to work. Powell stated that "French was terminated on the basis that she was not a reliable employee." [1]

The covenant of good faith and fair dealing is implicit in at-will employment contracts. *Reed v. Municipality of Anchorage,* 782 P.2d 1155, 1158 (Alaska 1989) (citing *Mitford v. de Lasala,* 666 P.2d 1000, 1006 (Alaska 1983)). Chilkoot's did not hire French for any specific term, therefore she was an "at-will employee." [2] As such, French could only be fired by Chilkoot's for a reason which did not violate the implied covenant of good faith and fair dealing. *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123, 1131 (Alaska 1989). "This covenant does not lend itself to precise definition, but it requires at a minimum that an employer not impair the right of an employee to receive the benefits of the employment agreement." *Jones v. Central Peninsula Gen. Hosp.,* 779 P.2d 783, 789 (Alaska 1989) (citing *Mitford,* 666 P.2d at 1006–07).

To prove her claim, French needed to demonstrate that Chilkoot's impaired her right to receive the benefit of the employment agreement and acted in bad faith. Initially, Chilkoot's, as the party moving for summary judgment, had the burden of showing that French's wrongful termination claim and breach of the implied covenant claim presented no material issue of fact and that the law required judgment in its favor. Alaska R.Civ.P. 56; *Bauman v. State, Div. of Family & Youth Services,* 768 P.2d 1097, 1099 (Alaska 1989). To discharge this burden, Chilkoot's was required to submit ad-

---

1. He affied that throughout her employment, management had spoken to French "regarding her absenteeism, frequent tardiness and general apathy toward her job and duties"; that French did not respond to requests that she improve her attendance and tardiness; that French was informed that she would be fired if the problems did not stop; that French had recently asked for a night off because a friend was getting married and, although she had been denied the night off and had been told she was needed at work, she had called in sick after attending the wedding; and that she also called in sick the evening she was terminated.

2. A general discussion of the at-will employment doctrine in Alaska is found in Penny L. Crook, *Employment at Will: The "American Rule" and Its Application in Alaska,* 2 Alaska L.Rev. 23 (1985).

missible evidence. *Wickwire v. McFadden,* 576 P.2d 986, 987 (Alaska 1978). Manager Powell satisfied Chilkoot's initial obligation under Civil Rule 56 when he affied that Chilkoot's terminated French because she was an unreliable employee. French could have then avoided summary judgment on this claim by producing competent evidence showing that there were issues of material fact to be tried. *Bauman,* 768 P.2d at 1099 (citing *State, Dep't of Highways v. Green,* 586 P.2d 595, 606 n. 32 (Alaska 1978) ("[T]he non-movant is required, in order to prevent summary judgment, to set forth specific facts showing that he could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact[ ] exists.")).

French, however, failed to provide any evidence to demonstrate that Chilkoot's did not terminate her for tardiness and absenteeism. French failed to deny or rebut Powell's sworn statements that she was terminated for her unreliability. *See Alaska–Canadian Corp. v. Ancow Corp.,* 434 P.2d 534, 536–38 (Alaska 1967) (considering the fact that non-movant affiant failed to deny statements made by movant-affiant in concluding that summary judgment in favor of movant was proper). In fact, French admitted in her post-termination letter to Chilkoot's that her supervisor, Terry May, had discussed her tardiness with her some days before her termination, and that "I agreed to being late some of the time."

French also failed to produce evidence supporting her claim she was terminated because she declined to date May's brother. Her deposition testimony established that her own opinion was based on unsupported assumptions and speculation. French had dated May's brother once, apparently voluntarily. French could not recall at her deposition whether May had ever said anything to her about continuing to date May's brother. French simply surmised at her deposition that "I think she would have very much liked it" if French had continued to date May's brother. French also surmised that May's attitude toward French changed after she stopped dating May's brother, and thought that was "why I might have been fired." When asked what factual basis she had for stating that Chilkoot's fired her because she refused to date May's brother, French testified that she was "assuming" that was the reason for her termination.[3]

French also failed to offer admissible evidence of a causal link supporting her claim she was terminated because she refused to participate in sex and drug parties. Her deposition testimony established that this potential reason for her termination was also ultimately based on her unsupported and speculative assumption that she had been fired because she had not participated in sex and drug parties, and on her belief that

---

3. After French was deposed but before Chilkoot's moved for summary judgment, Chilkoot's directed Interrogatory No. 8 to French asking her to state "all facts ... including ... contents of conversations, dates of conversations" upon which she based the allegations in her complaint that Terry May attempted to persuade French to date May's brother and that her relationship with May deteriorated after French declined to do so. The full text of French's answer provides:

> Shortly after refusing to date Ms. May's brother, plaintiff heard that she was going to be fired from co-workers, even though there was no change in her job performance, Ms. May became extremely antagonist [sic] towards plaintiff, and finally plaintiff was fired for no legitimate, apparent reason.

Chilkoot's moved to compel discovery of specific facts about what French had allegedly heard, and argued to the trial court that her failure to provide the requested information demonstrated that she "cannot supply any factual basis for her claims." So far as we can see from the record,

French did not supplement her response to Interrogatory No. 8 and the trial court did not rule on Chilkoot's motion to compel.

The interrogatory answer was insufficient to establish the existence of a genuine fact dispute material to the termination claim. In part it recited inadmissible hearsay and legal conclusions. It alleged admissible facts (plaintiff refused to date the brother of Ms. May, who became extremely antagonistic), but her sworn deposition testimony made it clear that she was simply surmising that her supervisor wanted French to date her brother and that French's refusal was the reason "why I might have been fired." In the face of the Powell affidavits, her unsupported surmise was too speculative to create a genuine fact dispute about the reason she was terminated.

We also note that French did not argue below or in this court that her interrogatory answers create a fact dispute or rebut the Powell affidavits.

Chilkoot's waitresses were expected to participate in such activities. French testified, "[t]hese are *assumptions* that you asked me what could have led to my termination. I told you it's a *possibility* of either my not dating Terry's brother or my not doing whatever people talk about. *I'm guessing.* I don't know specifically." (Emphasis added.) In response to Interrogatory No. 10, which sought detailed and specific information about her claim that Chilkoot's required her to engage in "unethical and illegal activities," she asserted under oath:

> At the time plaintiff was employed by Chilkoot's, a known factor in longevity of employment at Chilkoot's was the use of drugs and sex with management. No one person made any demands, it was just understood. *See, also,* copies of "[Pournography]" previously supplied and written by general manager Doran Powell.

Her interrogatory response did not establish any factual foundation for that answer.[4] The issue of "Pournography," Chilkoot's internal employee newsletter authored by Doran Powell, to which she referred was not evidence of "unethical and illegal activities."

Chilkoot's argued in the trial court that French had failed to provide any information in her discovery responses or her deposition supporting her wrongful termination claim sufficient to withstand Chilkoot's summary judgment motion. In opposing Chilkoot's motion, French argued in part that Powell's affidavit was not based on first-hand information, but she offered no further evidence, such as an affidavit from herself, to bolster her claim.

■ "Mere assertions of fact in pleadings and memoranda are insufficient for denial of a motion for summary judgment." *Green,*

586 P.2d at 607 n. 32 (citing *Brock v. Rogers & Babler, Inc.,* 536 P.2d 778, 782–83 (Alaska 1975) and *Braund, Inc. v. White,* 486 P.2d 50, 53–54 (Alaska 1971)). French's own deposition testimony established that her wrongful termination claim was based only on her unsupported suppositions. *See Yurioff v. American Honda Motor Co.,* 803 P.2d 386, 389 (Alaska 1990) (concluding that summary judgment was proper because opponent's rebuttal consisted of only his own equivocal deposition testimony).[5] Therefore, the superior court correctly entered summary judgment against French on her wrongful termination claim.

### C. Gender Discrimination Claim

French's complaint stated that her termination amounted to sex discrimination. She argues on appeal that Chilkoot's violated AS 18.80.220(a)(1) & (4), Alaska's anti-discrimination statute, by engaging in quid pro quo harassment and hostile work environment harassment. She argues that the trial court erred in granting summary judgment to Chilkoot's on her gender discrimination claim because Chilkoot's failed to prove that her termination was not pretextual and because there was a question of fact whether French found Chilkoot's actions offensive.

#### 1. Quid pro quo harassment

■ Quid pro quo gender harassment occurs when an employer conditions employment benefits on sexual favors. *Ellison v. Brady,* 924 F.2d 872, 875 (9th Cir.1991). It arises when an employer relies upon his or her authority "to extort sexual consideration from an employee." *Canada v. Boyd Group, Inc.,* 809 F.Supp. 771, 777 (D.Nev.1992) (citing *Miller v. Bank of America,* 600 F.2d 211,

---

4. Interrogatory No. 10 asked French to explain in detail all "unethical and illegal activities" Chilkoot's required of her, "giving specific dates of each activity, the nature of each activity, the name of the person who required you to engage in such activity and your response or action thereto." By letter, Chilkoot's attorney informed French's attorney her response was deficient, asked her to "fully document" her response, and asserted that the interrogatory required specific details. By letter, her attorney answered that she "has responded to the best of her recollection." Chilkoot's then moved to compel a re-

sponse to the interrogatory and argued that French "cannot supply any factual basis for her claims." So far as the appellate record reveals, French never elaborated on her interrogatory answer, and the court did not rule on the motion to compel.

5. French's sworn interrogatory answers did not create genuine fact disputes, nor did French argue below or on appeal that they did. They are, in any event, deficient for the reasons discussed above.

213 (9th Cir.1979)). To support an allegation of quid pro quo harassment, a plaintiff must offer evidence of a defendant's statements or actions which indicate that plaintiff's continued employment, or receipt of other employment benefits, was contingent on plaintiff granting sexual favors. *Canada*, 809 F.Supp. at 777.

■■■■■ By asserting that Chilkoot's terminated her employment because she refused to date her supervisor's brother, French pleads quid pro quo gender discrimination. Because Powell's affidavits described legitimate reasons for her termination, French was obliged to demonstrate the existence of a genuine, material fact dispute to avoid summary judgment on this claim. *Martech Constr. Co., Inc. v. Ogden Envtl.,* 852 P.2d 1146, 1149, 1150 n. 7 (Alaska 1993). French, however, failed to do so. She produced no evidence of any statement or action reasonably permitting an inference that her employment was in fact conditioned on dating her supervisor's brother. As discussed above, French offered only her inadmissible personal guesses, assumptions, and opinion that "I think [the supervisor] would have very much liked it." Once an employer has provided admissible evidence that an employee was terminated for legitimate reasons, speculation of the sort offered by French is insufficient to raise a genuine fact dispute about whether the employee has suffered quid pro quo gender discrimination.[6] The superior court did not err in granting summary judgment to Chilkoot's on this claim.

### 2. *Hostile work environment harassment*

■■■■ French argues on appeal that it was error to grant summary judgment to Chil-

koot's on her hostile work environment claim because material fact disputes existed. French alleged in her complaint that the conduct of Chilkoot's in "requiring" her to "engage in unethical and illegal activities" constituted sex discrimination. French did not cite AS 18.80.220(a) in her complaint, but later implicitly alleged a violation of that statute. That statute provides:

Unlawful employment practices. (a) It is unlawful for

(1) an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's race, religion, color or national origin, or because of the person's age, physical or mental disability, sex, marital status, changes in marital status, pregnancy or parenthood when the reasonable demands of the position do not require distinction on the basis of age, physical or mental disability, sex, marital status, changes in marital status, pregnancy or parenthood;

. . . .

(4) an employer, labor organization, or employment agency to discharge, expel, or otherwise discriminate against a person because the person has opposed any practice forbidden under AS 18.80.200— 18.80.280 or because the person has filed a complaint, testified, or assisted in a proceeding under this chapter. . . .

AS 18.80.220(a).

■■■■ We have not previously decided whether AS 18.80.220 encompasses a claim of

---

**6.** French argues that Powell's sworn explanations of why she was terminated were inadmissible. Powell was Chilkoot's general manager. His two affidavits were sufficient to establish that he had personal knowledge of the reasons why French was terminated. His conversations with May were admissible because they demonstrated the states of mind of Powell and May, Powell's understanding of why French was terminated, and Powell's agreement with her termination. Alaska R.Evid. 803(3); *Van Huff v. Sohio Alaska Petroleum Co.,* 835 P.2d 1181, 1186 (Alaska 1992).

Powell's affidavits required French to produce admissible evidence reasonably permitting an in-

ference Powell's explanation was pretextual. The assertions made in her deposition were insufficient, but assuming she did not have personal knowledge adequate to execute an affidavit containing admissible evidence, she had the ability to conduct discovery to obtain information rebutting Powell's affidavits. Alaska R.Civil P. 56(f). She could have deposed Powell to rebut the foundation for his statements or to demonstrate that he was in error or not credible. She also could have deposed Terry May and other employees or former employees, assuming they would not voluntarily provide rebutting affidavits.

hostile or abusive work environment harassment, nor have we discussed what constitutes that type of harassment. We do so now.

Preliminarily, we note that gender-based discrimination which affects the terms and conditions of the work place appears to violate the plain language of AS 18.80.220.

That reading of Alaska's anti-discrimination statute is confirmed by authority interpreting its federal counterpart.[7] In deciding whether our statute encompasses such a claim and what the elements of that claim may be, we consider federal precedent for guidance.[8]

In hostile work environment cases, "employees work in offensive or abusive environments."[9] *Ellison*, 924 F.2d at 875 (citing A. Larson, *Employment Discrimination* § 41.61 at 8–151 (1989)). "Conduct which unreasonably interferes with work performance can alter a condition of employment and create an abusive working environment." *Ellison*, 924 F.2d at 877. In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–2406, 91 L.Ed.2d 49 (1986), the U.S. Supreme Court held that Title VII prohibits sexual harassment that takes the form of a hostile work environment because

such an atmosphere alters the "terms" and "conditions" of the employment.

We conclude from the plain language of AS 18.80.220 and from the federal precedent interpreting Title VII that discriminatory behavior sufficiently severe or pervasive to alter the conditions of the victim's employment and to create a discriminatory hostile work environment violates AS 18.80.220.

We must now decide whether French sufficiently supported her hostile work environment claim after Chilkoot's moved for summary judgment and supported its motion with the Powell affidavits.

The Supreme Court recently elaborated on the *Meritor* hostile work environment standard in *Harris v. Forklift Systems, Inc.*, —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The Court noted in *Harris* that it was taking a "middle path" in deciding what conduct was actionable. *Id.* at ——, 114 S.Ct. at 370. The Court stated that the challenged conduct must be severe or pervasive enough "to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive."[10] *Id.* The *Harris* Court

---

**7.** Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

**8.** We have examined federal Title VII decisions for guidance in considering the Alaska anti-discrimination statutes. *Alaska State Comm'n for Human Rights v. Yellow Cab*, 611 P.2d 487, 490 (Alaska 1980).

**9.** See also Equal Employment Opportunity Commission guidelines which describe hostile environment harassment as "conduct [which] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(3).

**10.** We do not decide today whether to adopt the perspective of a "reasonable person," a "reasonable woman," or a "reasonable victim" to determine whether an "objectively hostile or abusive environment" exists for purposes of sexual harassment claims under AS 18.80.220. *Compare Harris*, —— U.S. at ——, 114 S.Ct. at 370

(arguably adopting a reasonable person standard) *with Ellison*, 924 F.2d at 879; *Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir.1987) (all adopting a reasonable woman standard where victim is a woman); *and Burns v. McGregor Elec. Indus.*, 989 F.2d 959, 965 (8th Cir.1993); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990); *EEOC: Policy Guidance on Sexual Harassment*, 8 Lab.Rel.Rep. (BNA) 405:6681, 6690 (Mar. 19, 1990) (adopting a reasonable victim standard). *See also* Caroline Forell, *Sexual and Racial Harassment*, 29 Trial 70 (1993) (discussing reasonable person, reasonable woman, and reasonable victim standards); Jane L. Dolkart, *Hostile Environment Harassment: Equality, Objectivity, and the Shaping of Legal Standards*, 43 Emory L.J. 151 (1994) (generally arguing for an individualized standard which focuses on the conduct of the alleged harasser and its effect on the actual plaintiff's work environment, considering the factors that inform the plaintiff's experience of harassment); Note, *Employment Discrimination—Sexual Harassment— New Jersey Supreme Court Adopts a Gender–Specific Reasonableness Standard—Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445 (1993), 107 Harvard L.Rev. 955 (1994) (approving a gender-specific standard). *But see* Paul B. Johnson, *The Reasonable Woman in Sexual Harassment Law: Progress or Illusion?*, 28 Wake Forest

also stated that there is no violation "if the victim does not subjectively perceive the environment to be abusive" because the conduct "has not actually altered the conditions of the victim's employment...." *Id.*

Applying that standard here, we conclude that the superior court did not err in granting summary judgment to Chilkoot's on French's hostile work environment claim.

French's complaint alleged that by requiring her to "engage in unethical and illegal activities" to continue her employment, Chilkoot's conduct constituted sex discrimination.[11]

Chilkoot's argued in the superior court that it was entitled to summary judgment on this claim because French, when responding to Chilkoot's attempt to discover the factual basis for this claim, failed to substantiate the allegations in her complaint. It also offered the first Powell affidavit, in which Powell gave a facially legitimate reason, her unreliability, for French's termination.

In opposition, French's memorandum relied exclusively on the November 20, 1988 issue of "Pournography" to exemplify a hostile environment. Although French did not call it to the superior court's attention, the only other evidence potentially supporting this claim was contained in her sworn interrogatory answers and deposition testimony.

Chilkoot's argued in reply that French had not demonstrated the existence of any genuine fact disputes to rebut Powell's sworn explanation for the termination. It noted that Count I of her complaint (claiming hostile work environment) only alleged Chilkoot's did three things wrong: the supervisor tried to get French to date her brother; French was required to engage in unethical and illegal activities; and Chilkoot's published the newsletter. As to the first, Chilkoot's argued that French's "guess" that she was terminated for reasons other than those explained by Powell was insufficient to create a genuine fact dispute. As to the second, Chilkoot's argued that in her deposition French denied engaging in any such activities, and had been unable to describe what was unethical or illegal about her employer's requests. As to the third, Chilkoot's argued that the newsletter was published more than a year before her termination. Chilkoot's also argued that French never complained that she felt the newsletter was derogatory, and at her deposition did not mention the newsletter as support for Count I of her complaint. Chilkoot's argued that she had not provided any evidence that she was in any way affected by the conduct. Chilkoot's also offered the second Powell affidavit, in which Powell affied in reference to the November 20, 1988 issue of "Pournography" that French "made it plain she was not offended and found it humorous."

After oral argument, the court granted summary judgment to Chilkoot's.[12] French moved for reconsideration and argued that the November 20, 1988 newsletter issue contained a veiled "put out or get out" message, made fun of her after she complained of a "sexual assault" (a bite on her buttocks) by a customer, and made other sexually-oriented comments; that the reasons for her discharge were pretextual; and that she did not join in the games "played by others" or in sex and drug parties and understood that another waitress had to "do" the general manager to get the shift she wanted. French filed copies of two other issues of "Pournography" not previously submitted to the court. The court denied the motion for reconsideration.

On appeal, French seems to argue that three particular circumstances supported her hostile work environment claim: (1) the

L.Rev. 619 (1993) (arguing a reasonable woman standard is seriously flawed). We emphasize that federal Title VII law does not bind our interpretation of AS 18.80.220 and is followed only where it has persuasive force.

11. French did not clearly articulate her hostile work environment claim. French's superior court and appellate arguments have not been particularly helpful to our understanding of the legal issues and alleged fact disputes presented by this claim.

12. At oral argument in the trial court, French's attorney asserted the existence of other fact circumstances that were potentially relevant to her claims, but offered no admissible evidence supporting those propositions. Such unsupported assertions do not satisfy Civil Rule 56, and could not have been considered by the trial court.

"Pournography" newsletter; (2) her supervisor's alleged wish that French date her brother; and (3) Chilkoot's alleged "sex and drug scene."

*The Newsletter.* The November 20, 1988 issue of "Pournography", Chilkoot's internal employee newsletter authored by Powell, commented on an episode involving French:

Shelly's buns were cause to 86 a good customer last week. Seems she was bending over the bar and he just couldn't help butt take a bite. I said throw him out for the night butt Shelly wanted more. Hell, I felt sorry for the guy. I've been tempted myself.

The same issue stated: "Overheard in the employee office: 'It's been awhile since any waitresses have been fired, Tom [McCullock, manager] must be celibate." [13]

French claims the newsletter imparted a veiled "put out or get out" message, made fun of female employees through sexual innuendo, and made fun of her after she complained about the customer's assaultive bite.

Manager Powell stated in an affidavit that the newsletter was "poking fun [at] barroom situations." Powell explained that the newsletter is designed to update employees on upcoming events, spotlight employees who have done well in their job, and be humorous. He also stated that "French's incident was noted in the Pournography because it was unusual. In a business of Chilkoot Charlie's nature, odd things tend to happen and it further has been my experience that employees are not necessarily shocked at things."

■ The comments in the "Pournography" newsletter may be genuinely offensive to many, especially to persons uninterested in patronizing, to use Powell's words, "a business of Chilkoot Charlie's nature." "Egregious examples" of harassment of the sort claimed in *Harris,* —— U.S. at ——, 114 S.Ct. at 369 (male company president often insulted female manager because of her gender and often made her the target of unwanted sexual innuendos), and *Meritor,* 477 U.S. at 66, 106 S.Ct. at 2405 (male supervisor repeatedly demanded sexual favors of female employee, fondled her, exposed himself, and forcibly raped her on several occasions), "do not mark the boundary of what is actionable." *Harris,* —— U.S. at ——, 114 S.Ct. at 371.

[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.*

■ It is not enough that the evidence may permit an inference of an objectively hostile or abusive work environment. "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment...." *Harris,* —— U.S. at ——, 114 S.Ct. at 370. For example, some persons might find particular work conditions acceptable that most people would consider excruciatingly abusive. There is no violation of AS 18.80.220(a) if the victim does not subjectively consider the environment to be abusive.

It is not necessary to decide whether the comments in the newsletter satisfy the objective standard for a hostile and abusive work environment, because French failed to demonstrate that there was a genuine dispute about her subjective perceptions.[14]

Powell stated in his affidavit that French never advised any management personnel, including himself, that she was offended by the newsletter and that French "made it

---

13. When French moved for reconsideration, she submitted two more issues of the newsletter. One, published more than a year after French was terminated, stated "[t]he girl just plain humps" in recognizing a waitress who received a financial bonus for her work effort. The other explained the dress code for a company party and stated "wear a dress if you have titties."

14. *Cf. DeAngelis v. El Paso Mun. Police Officers' Ass'n,* 51 F.3d 591 (5th Cir.1995) (holding that disparaging comments regarding female police sergeant in police association newsletter did not meet federal standard of objective offensiveness under Title VII).

plain she was not offended [by the biting article] and found it humorous." French never disputed Powell's statement that she found the newsletter humorous; she never asserted she found its contents hostile or abusive. She offered no affidavit. Her deposition testimony did not imply that she subjectively considered the newsletter hostile or abusive.[15] Her interrogatory answers did not state that she considered the newsletter to have created a hostile or abusive environment.[16]

*Attitude of French's Supervisor.* French surmised that the alleged attitude of her immediate supervisor affected French's employment. As seen above, a claim of hostile work environment requires conduct which creates "an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris*, —— U.S. at ——, 114 S.Ct. at 370. French's inadmissible speculation that her supervisor wanted French to date her brother and that French's failure to do so led to her termination was insufficient to rebut Powell's sworn explanations for her termination. Assuming the record supports a conclusion that French was subjectively offended by her supervisor's asserted desire, French nonetheless failed to produce facts reasonably permitting an inference that her supervisor created a hostile work environment.

*Sex and Drug Scene.* An interrogatory asked French to explain "in detail" the assertion in her complaint that Chilkoot's had required her to engage in "unethical and illegal activities," and also asked her to describe the specific nature and dates of each activity, the name of the person requiring her to engage in the activity, and her response to Chilkoot's conduct. French answered that when she was employed there, "a known factor in longevity of employment at Chilkoot's was the use of drugs and sex with management. No one person made any demands, it was just understood." She also referred to the issues of "Pournography," written by Powell.

Another interrogatory asked French to describe in detail any manner in which Chilkoot's sexually discriminated against her. She responded that her "failure to participate in Chilkoot's 'sex and drug scene' resulted in a hostile work environment. . . ." She stated that there was quid pro quo sex discrimination because she failed to date her supervisor's brother. She also stated that the bar manager called her unspecified names and referred to her in a "derogatory

---

15. As an employee, French presumably had no duty to object to management if she felt she was the victim of a discriminatory and abusive working environment. *See Meritor*, 477 U.S. at 73, 106 S.Ct. at 2408–2409 (rejecting contention that employee should have reported her grievance of sexual harassment to her employer who was the perpetrator, where petitioner's grievance procedure was inadequate to encourage harassment victims to come forward); *Henson v. City of Dundee*, 682 F.2d 897, 913–14 (11th Cir.1982) (Clark, J., concurring and dissenting) ("Clearly a supervisor by virtue of his position is enhanced in his ability to create an offensive environment when compared to the janitor, for example. When a supervisor creates such an environment, women employees are not apt to complain for fear of retaliation."). To object in an abusive situation may invite retaliation.

As a litigant, however, French had a duty to rebut the Powell affidavit to avoid summary judgment on the harassment claim. *Bauman*, 768 P.2d at 1099. Even though she had no duty to complain to her employer, if she considered the newsletter hostile or abusive, she should have so informed the court in order to answer Powell's affirmative assertion to the contrary.

16. One interrogatory asked French to explain in detail all "unethical and illegal activities" Chilkoot's allegedly required of French. Her answer implied employees were to engage in sex and use drugs with management, but gave no specifics of the sort expressly sought by the interrogatory (dates, nature of activity, names, and her response). Her answer also cited copies of the newsletter. Chilkoot's argued that the response was inadequate, but the record does not reveal that French supplemented her answer. See footnote 4, *supra*. When Chilkoot's later moved for summary judgment, argued that French was not subjectively offended, and supported its motion with an affidavit in which Powell affied that French found the biting article "humorous," French did not claim in the trial court that this interrogatory answer was evidence that would create a genuine fact dispute about her subjective perceptions. More importantly, French does not argue on appeal that we should consider this indirect and ambiguous interrogatory answer to be evidence that created a genuine fact dispute about whether French was subjectively offended. We consequently decline to do so sua sponte.

manner" because she refused to "play games."

French failed to provide admissible evidence to support her claim that there was a sex and drug scene which created an abusive work environment. The nonspecific and factually unsupported assertions that there was such a "scene" at Chilkoot's were insufficient to survive summary judgment. By offering an affidavit containing a facially valid explanation for her termination, Chilkoot's obliged French to produce facts permitting an inference that the work environment really was hostile, and had adversely affected her employment. French failed to make that showing or seek a continuance, under Civil Rule 56(f), in which to gather facts to defeat Chilkoot's summary judgment motion.

In short, although we conclude that AS 18.80.220 encompasses a claim for a discriminatorily hostile work environment, we also conclude that French's claim was factually deficient. To avoid summary judgment after Chilkoot's factually disputed the reasons for her termination and her subjective perceptions of the environment, French was obliged to offer admissible evidence satisfying both the objective and subjective standards for such a claim. The superior court did not err in granting summary judgment to Chilkoot's when French failed to do so.

### D. Defamation Claim

■ After Chilkoot's terminated French, Chilkoot's manager McCullock spoke with French's boyfriend, Shawn Norton. Norton testified at his deposition that McCullock referred to French with degrading words; he also testified that McCullock told Norton that French had engaged in sexual relations with a former Chilkoot's employee and had traded the same employee sex for drugs. McCullock denied making the statements, and asserted that Norton had initiated a discussion with McCullock on the subject of French's alleged infidelity to Norton.

The superior court granted summary judgment to Chilkoot's on French's defamation claim.

■ To prevail on a defamation claim, a plaintiff has to establish (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either "per se" actionability or special harm. See McAdoo v. Diaz, 884 P.2d 1385, 1390 (Alaska 1994); Restatement (Second) of Torts § 558 (1977). "A communication is defamatory if it tends to harm the reputation of another so as to lower him [or her] in the estimation of the community or to deter third persons from associating or dealing with him [or her]." Green v. Northern Publishing Co., Inc., 655 P.2d 736, 739 (Alaska 1982), cert. denied, 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983) (citing Restatement (Second) of Torts § 559 (1977)).

■ Chilkoot's argues that summary judgment was appropriate because French suffered no special harm. We agree French offered no evidence reasonably permitting an inference that she suffered special harm, but the absence of such evidence is not fatal to her claim if McCullock's statements were defamatory per se. Alaska Statebank v. Fairco, 674 P.2d 288, 295 (Alaska 1983).

■ For a publication to be defamatory per se, "the words used must be so unambiguous as to be reasonably susceptible of only one interpretation—that is, one which has a natural tendency to injure another's reputation." Fairbanks Publishing Co. v. Pitka, 376 P.2d 190, 194 (Alaska 1962) (libel per se).

■ McCullock allegedly stated that French had traded sex for drugs. Such a statement alleges serious sexual misconduct and criminal activity. See AS 11.66.100 ("A person commits the crime of prostitution if the person engages in or agrees or offers to engage in sexual conduct in return for a fee."). Such a statement is defamatory per se. "One who publishes a slander that imputes serious sexual misconduct to another is subject to liability to the other without proof of special harm." Restatement (Second) of Torts § 574 (1977). See Hollman v. Brady, 233 F.2d 877, 878 (9th Cir.1956) (affirming the District Court for the Territory of Alaska in holding the statement, "[y]our wife is an ex-whore from Butte, Montana," to be slanderous per se).

■ Likewise, where the words impute a serious crime to the plaintiff, recovery is permitted without proof of special damages. *See Alaska Statebank,* 674 P.2d at 295 (providing that "where 'the words spoken by the defendant were such as to ... impute a crime to the plaintiff ...' recovery is permitted without proof of special damages," and citing *Cinquanta v. Burdett,* 154 Colo. 37, 388 P.2d 779, 780 (1963) (en banc)). *See also* Restatement (Second) of Torts § 571 (1977) ("One who publishes a slander that imputes to another conduct constituting a criminal offense is subject to liability to the other without proof of special harm if the offense imputed is of a type which, ... would be (a) punishable by imprisonment ... or (b) regarded by public opinion as involving moral turpitude.).

Consequently, French did not need to prove injury resulting from the comments and her asserted failure to demonstrate special harm could not be a basis for affirming the summary judgment on the defamation claim.

■ Chilkoot's argues that McCullock's alleged comments are not actionable because they were conditionally privileged.[17] A statement is conditionally privileged if its maker reasonably believes that the statement affects a sufficiently important interest of the recipient and the recipient is "a person to whom its publication is otherwise within the generally accepted standards of decent conduct." Restatement (Second) of Torts § 595 (1977); *see Jones v. Central Peninsula Gen. Hosp.,* 779 P.2d 783, 790 (Alaska 1989) (quoting Restatement (Second) of Torts § 595 (1977) and recognizing a conditional privilege if the circumstances induce a correct or reasonable belief that there is information that affects a sufficiently important interest of the recipient or a third person). In deciding if a publication is within "generally accepted standards of decent conduct," an important factor is whether the statement is made in response to a request for such information or is volunteered. Restatement (Second) of Torts § 595 (1977).

■ To obtain summary judgment on a privilege theory, Chilkoot's had to establish that a recognized public or private interest justified the utterance of McCullock's words. *Schneider v. Pay'N Save Corp.,* 723 P.2d 619, 623 (Alaska 1986) (citing William Prosser, *The Law of Torts* § 115, at 796 (4th ed. 1971)). "Whether the occasion gives rise to a privilege is a question of law for the court." *Schneider,* 723 P.2d at 623 (citing Restatement (Second) of Torts § 619 (1977)). "If the facts are in dispute, the jury determines whether a conditional privilege has been abused." *Id.* (citing Prosser § 115, at 796).

McCullock and Norton differ on whether Norton approached McCullock and asked him about French's sexual activity with another man. McCullock swore in an interrogatory answer that Norton approached him for advice on that subject. Norton, however, testified in deposition that McCullock made the disparaging remarks when Norton and McCullock worked in proximity as their jobs required, not because Norton sought McCullock's advice. There was consequently a genuine fact dispute about whether McCullock's alleged statements were privileged.

That dispute can only be resolved by the trier of fact. The superior court erred in granting summary judgment on the defamation claim.

### E. Attorney's Fees

After summary judgment was entered in its favor, Chilkoot's sought an attorney's fee award of $16,789.50. The superior court awarded Chilkoot's $10,000. French claims the award was excessive. Chilkoot's claims the award was reasonable and appropriate under Civil Rule 82.

It is not necessary to consider the merits of the attorney's fees issue. Given the reversal of the summary judgment on the defama-

---

17. One who publishes defamatory matter concerning another is not liable for the publication if:
   a) the matter is published upon an occasion that makes it conditionally privileged and

b) the privilege is not abused.
*Schneider v. Pay'N Save Corp.,* 723 P.2d 619, 623 (Alaska 1986) (quoting Restatement (Second) of Torts § 593 (1977)).

tion claim, the attorney's fees award must be vacated.

## IV. CONCLUSION

For these reasons, we REVERSE the superior court's grant of summary judgment on the defamation claim, and REMAND to the superior court for proceedings consistent with this opinion. We AFFIRM the superior court's grant of summary judgment on all other issues.[18] We VACATE the award of attorney's fees.

---

18. French also alleges that Chilkoot's violated AS 23.05.140(b) because it failed to pay her all wages and compensation within three days of termination and that she was entitled to more than one week paid vacation per Chilkoot's employee manual.

Neither claim has merit. Chilkoot's timely tendered the final paycheck to French within three working days of termination. Further, the plain language of the employee manual does not entitle French to additional vacation pay. The Powell affidavit also explained the written vacation policy and French produced no evidence supporting her contrary interpretation of that policy.

The superior court correctly granted summary judgment to Chilkoot's on both issues.